[S. F. No. 22634.   In Bank.   Sept. 16, 1969.]

JONATHAN TODD BYERS, Plaintiff and Respondent, v. THE JUSTICE COURT FOR THE UKIAH JUDICIAL DISTRICT OF MENDOCINO COUNTY, Defendant and Respondent; THE PEOPLE, Real Party in Interest and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Louise H. Renne, Robert R. Granucci and Derald E. Granberg, Deputy Attorneys General, for Real Party in Interest and Appellant.

John W. Poulos and Rawles, Nelson, Golden, Poulos & Hinkle for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

PETERS, J.—The People appeal from a judgment of the Superior Court of Mendocino County granting a writ of prohibition restraining the Justice Court for the Ukiah Judicial District from proceeding further against plaintiff Jonathan Todd Byers on count two of a criminal complaint filed in the justice court against him. Count one of the complaint charged Byers with improper and unsafe passing in violation of section 21750 of the Vehicle Code,[1] and count two charged him with violating one of the "hit-and-run" provisions in the Vehicle Code, section 20002, subdivision (a),[2] by leaving the scene of an automobile accident resulting in property damage

---

[1] Section 21750 provides: "The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left at a safe distance without interfering with the safe operation of the overtaken vehicle, subject to the limitations and exceptions hereinafter stated."

[2] At the time of the accident section 20002, subdivision (a), provided: "The driver of any vehicle involved in an accident resulting in damage to any property including vehicles shall immediately stop the vehicle at the scene of the accident and shall then and there either: (1) Locate

without furnishing his identity and certain other information to the owner or person in charge of the damaged property.

Byers demurred to count two on the ground that section 20002, subdivision (a), was unconstitutional as applied because it violated his privilege against self-incrimination. It was stipulated by counsel that the two alleged Vehicle Code violations arose out of the same occurrence, i.e., that the alleged improper passing caused the accident from which Byers assertedly departed without providing statutorily required information. The justice court overruled the demurrer.

Upon application by Byers the superior court granted a writ of prohibition restraining further proceedings on count two on the ground that section 20002, subdivision (a), could not be applied against Byers under the circumstances of the case without infringing his privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States.

■ The Fifth Amendment privilege against self-incrimination—a protection against state as well as federal governmental action (*Malloy* v. *Hogan,* 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489])—ordinarily provides a defense to prosecution for failure to supply statutorily required information in cases where the defendant has reasonable ground to apprehend a substantial danger that such information, if supplied, would be available to prosecuting authorities and could be used as a significant " 'link in a chain' " of evidence tending to establish his guilt of some criminal offense. (*Marchetti* v. *United States,* 390 U.S. 39, 48 [19 L.Ed.2d 889, 88 S.Ct. 697]; *Grosso* v. *United States,* 390 U.S. 62, 66-67 [19 L.Ed.2d 906, 911, 88 S.Ct. 709]; *Haynes* v. *United States,* 390 U.S. 85, 95-97, 101 [19 L.Ed.2d 923, 931-932, 934, 88 S.Ct. 722]; *Albertson* v.

and notify the owner or person in charge of such property of the name and address of the driver and owner of the vehicle involved, or; (2) Leave in a conspicuous place on the vehicle or other property damaged a written notice giving the name and address of the driver and of the owner of the vehicle involved and a statement of the circumstances thereof and shall without unnecessary delay notify the police department of the city wherein the collision occurred or, if the collision occurred in unincorporated territory, the local headquarters of the Department of the California Highway Patrol. Any person failing to stop or to comply with said requirements under such circumstances is guilty of a misdemeanor and upon conviction thereof shall be punished by imprisonment in the county jail for not to exceed six months or by a fine of not to exceed five hundred dollars ($500) or by both."

In 1967 this section was amended in several minor respects not pertinent to this case.

*SACB,* 382 U.S. 70, 77-79, 81 [15 L.Ed.2d 165, 170-171, 172, 86 S.Ct. 194].)

The crucial inquiry in determining the applicability of the privilege to a statutory disclosure-of-information requirement is whether the individual seeking to avoid disclosure faces "substantial hazards of self-incrimination" because in his particular case there is a substantial likelihood that information disclosed by him in compliance with the statute could by itself or in conjunction with other evidence be used to secure his conviction of a criminal offense. (*Marchetti* v. *United States, supra,* 390 U.S. 39, 61 [19 L.Ed.2d 889, 905, 88 S.Ct. 697].)

In *Marchetti, Grosso, Haynes,* and *Albertson,* the registration statutes with which petitioners failed to comply required a "highly selective group" of persons "inherently suspect" of criminal activity (*Albertson* v. *SACB, supra,* 382 U.S. 70, 79 [15 L.Ed.2d 165, 171, 86 S.Ct. 194]) to disclose information concerning acts or activities which were either clearly illegal under federal law (as in *Albertson*) or very likely illegal under federal or state law. However, in each case the crime-directed character of the registration requirement was viewed as important only insofar as it supported the claims of the specific petitioners that they faced "substantial hazards of self-incrimination" justifying invocation of the privilege.

In *Marchetti* the court specifically recognized that there might be circumstances in which a person subject to the registration requirements of the federal wagering tax could not demonstrate that compliance would create for him "substantial hazards of self-incrimination" so as to warrant his invocation of the privilege. (*Marchetti* v. *United States, supra,* 390 U.S. 39, 61 [19 L.Ed.2d 889, 905, 88 S.Ct. 697] ; compare *Haynes* v. *United States, supra,* 390 U.S. 85, 97 [19 L.Ed.2d 923, 932, 88 S.Ct. 722] ; *Grosso* v. *United States, supra,* 390 U.S. 62, 64 [19 L.Ed.2d 906, 909, 88 S.Ct. 709].)[3]

---

[3]The court in *Marchetti* noted that "Wagering and its ancillary activities are very widely prohibited under both federal and state law." (390 U.S. at p. 44 [19 L.Ed.2d at p. 895].) However, the court discussed in detail the state laws prohibiting gambling and wagering in Connecticut, the state where petitioner allegedly conducted his wagering activities, before concluding that "Every aspect of petitioner's wagering activities . . . subjected him to possible state or federal prosecution" (*id.* at p. 47 [19 L.Ed.2d at p. 897]) and that "In these circumstances, it can scarcely be denied that the obligations to register and to pay the occupational tax created for petitioner 'real and appreciable' . . . hazards of self-incrimination" (*id.* at p. 48 [19 L.Ed.2d at p. 897]).

In *Grosso* the court also referred to "the various state and federal penalties which have been imposed upon wagering" but pointed out

Four Court of Appeal cases have considered whether the privilege against self-incrimination precludes prosecution under "hit-and-run" statutes. In the early case of *People* v. *Diller*, 24 Cal.App. 799 [142 P. 797], the court rejected the argument that the "hit-and-run" statute there in issue was inherently in conflict with the then-controlling state constitutional prohibition against self-incrimination. There was no evidence to show that had the defendant driver complied with the statute he might have incriminated himself, and the court expressly left open the question whether the privilege could be asserted in a case where there was a showing that, because of the particular facts surrounding the "hit-and-run" accident, the defendant might reasonably have feared that the disclosure of information required by the statute would tend to incriminate him.[4] *Diller* was followed in *People* v. *Fodera*, 33 Cal.App. 8 [164 P. 22].

In *People* v. *Limon*, 252 Cal.App.2d 575 [60 Cal.Rptr. 448], a defendant convicted of a "hit-and-run" violation (Veh.

---

specifically that "Pennsylvania, in which petitioner allegedly accepted wagers, has adopted a comprehensive statutory system for the punishment of gambling and ancillary activities" in concluding that Grosso was entitled to invoke the privilege. (390 U.S. 62, 64 [19 L.Ed.2d 906, 909, 88 S.Ct. 709].)

It is possible that certain persons engaged in wagering in Nevada, where only "lotteries and certain other wagering activities taxable under [the federal wagering tax]" are prohibited (*Marchetti* v. *United States, supra*, 390 U.S. at pp. 45-46 [19 L.Ed.2d at p. 896]), are not privileged to refrain from complying with the provisions of the federal wagering tax.

[4] Two leading decisions by courts in other states have similarly upheld the essential validity of "hit-and-run" statutes against claims that they were inherently in conflict with state constitutional prohibitions against compulsory self-incrimination while leaving open the question whether in certain narrow circumstances a claim of privilege would excuse noncompliance with such statutes. (*Commonwealth* v. *Joyce* (1951) 326 Mass. 751, 756 [97 N.E.2d 192]; *Ex parte Kneedler* (1912) 243 Mo. 632, 640 [147 S.W. 983, 1913C 923, 40 L.R.A. N.S. 622].)

It would appear that the recent decision of the Supreme Court of Illinois in *People* v. *Lucus* (1968) 41 Ill.2d 370 [243 N.E.2d 228], construing the federal constitutional privilege, follows the same approach as *Diller* and the cases cited above. The court stated: "Using the standard of *Marchetti* v. *United States* . . . the [Illinois "hit-and-run"] statute's provisions do not present a substantial and real hazard of [self-]incrimination." (243 N.E.2d at p. 231.) The court did not expressly leave open the question whether the federal privilege would ever excuse noncompliance with a "hit-an-run" statute, but the statement of facts indicates that this question was implicitly left open. The appellant in *Lucus* was neither convicted of nor charged with any other offense in connection with the accident which gave rise to his statutory duty to identify himself. Nor is there any indication that any such charge would have been warranted. In other words, there was no showing that the appellant had any basis for a reasonable fear that compliance with the "hit-and-run" statute would lead to self-incrimination.

Code, § 20001 [covering accidents involving personal injury])
established that prior to the accident he had been drinking
rather freely, and he claimed that the "hit-and-run" statute
was unconstitutional as applied to him because by stopping
and identifying himself as required by the statute he might
have incriminated himself with regard to a possible charge of
driving under the influence of liquor. Although the defendant
thus alleged the sort of specific fear of self-incrimination care-
fully distinguished in *Diller,* the court disposed of defend-
ant's claim merely by citing *Diller* for the proposition that
the "validity of the statute was established long ago." (252
Cal.App.2d at p. 579.)

The later case of *People* v. *Bammes,* 265 Cal.App.2d 626,
634-635 [71 Cal.Rptr. 415], rejected the claim of privilege
by a defendant who was convicted of "hit-and-run" and
charged with but acquitted of vehicular manslaughter in con-
nection with the accident furnishing the basis of the "hit-and-
run" conviction. The court sought to distinguish the cases of
*Marchetti, Grosso,* and *Haynes* on the ground that the stat-
utes there involved were directed almost exclusively against a
highly selective group of individuals inherently suspect of
criminal activities whereas the "hit-and-run" statutes do not
require the driver to admit involvement in the accident but
only to identify himself as a driver of a vehicle "which was at
or near the scene of the accident when it occurred." (*Id.* at
p. 635.)

The court in *Bammes* inaccurately characterized the "hit-
and-run" statute involved in that case (Veh. Code, § 20001),
a statute similar in all relevant particulars to the statute
involved in the present case; it also inaccurately distin-
guished *Marchetti, Grosso,* and *Haynes* from the case before it.
First, although it is true that neither section 20001 nor sec-
tion 20002 explicitly requires drivers involved in accidents to
identify themselves *as* involved drivers, neither can fairly be
read to require only that an involved driver identify himself
as merely having been "at or near the scene of the accident
when it occurred." Even if these statutes could be so read, it
seems clear that in almost all circumstances it would be obvi-
ous to the person to whom the identification was made that
the person supplying identification was a driver involved in
the accident.

Second, although not all drivers involved in accidents are
lawbreakers, there is a substantial correlation between being a

driver involved in an accident and being a driver who has contemporaneously violated one or more vehicle laws.

"Hit-and-run" cases should be contrasted with *Shapiro* v. *United States*, 335 U.S. 1 [92 L.Ed. 1787, 68 S.Ct. 1375], where the statute involved was directed at a class of individuals not ordinarily suspect of criminal activities, namely, dealers in commodities. The court there held that no violation of the privilege against self-incrimination was involved in a prosecution based in part on information contained in records required to be kept for price regulation purposes where the records were of a kind customarily kept by such persons and where the required records had assumed "public aspects" which rendered them at least analogous to public documents.

Although the group subject to "hit-and-run" statutes, drivers involved in accidents, is not inherently suspect of criminal activities to the same extent as the groups regulated by the statutes in *Marchetti, Grosso,* and *Haynes,* there is in the accident cases, unlike the situation in *Shapiro,* a substantial shadow of suspicion cast upon the persons regulated by the statute. Where circumstances in addition to membership in a suspect group regulated by a disclosure statute show that compliance with the statute would involve self-incrimination, the rules set forth in *Marchetti, Grosso,* and *Haynes,* are applicable.

Decisions of the United States Supreme Court make clear that the privilege against self-incrimination is a personal one, and that whether the government may require a disclosure depends upon the facts of each case. ██ Invocation of the privilege is not limited to situations in which the *purpose* of the inquiry is to get an incriminating answer. It is the *effect* of the answer that is determinative. "To sustain [a claim of] privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (*Hoffman* v. *United States,* 341 U.S. 479, 486-487 [95 L.Ed. 1118, 1124, 71 S.Ct. 814] ; see Mansfield, *The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information,* 1966 Sup.Ct.Rev. 103, 147-148.)

██ Nor is invocation of the privilege limited to situations in which the information requested would, without more, support a criminal conviction. "The privilege . . . not only extends to answers that would in themselves support a convic-

tion . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute. . . ." (*Id.* at p. 486 [95 L.Ed. at p. 1124]; accord, *Marchetti* v. *United States, supra,* 390 U.S. 39, 48 [19 L.Ed.2d 889, 897, 88 S.Ct. 697]; *Albertson* v. *SACB, supra,* 382 U.S. 70, 78 [15 L.Ed.2d 165, 171, 86 S.Ct. 194]; *Malloy* v. *Hogan, supra,* 378 U.S. 1, 11-12 [12 L.Ed.2d 653, 661-662, 84 S.Ct. 1489]; see McCormick, Evidence (1954) § 129, p. 271.) For example, in *Albertson* the court held that orders compelling petitioners to complete and file form IS-52 (which sought disclosure from members of "Communist-action organizations" of the name of the organization, place and date of birth, and a list of offices held in the organization and duties thereof) violated the privilege because a response to any of the questions "might be used as evidence in or at least supply investigatory leads to a criminal prosecution." (382 U.S. at p. 78 [15 L.Ed.2d at p. 171].)

We are satisfied that the privilege is applicable when a driver of a motor vehicle involved in an accident is confronted with a statutory requirement to stop and divulge his identity and reasonably believes that compliance with the statute will result in self-incrimination. (See Mansfield, *supra,* 1966 Sup.Ct.Rev. 103, 121-122; McCormick, *supra,* § 134, pp. 283-284;[5] cf. *Rembrandt* v. *City of Cleveland* (1927) 28 Ohio App. 4 [161 N.E. 364] [ordinance requiring drivers involved in accidents to make full report to police].) "That [the driver's] operation of a motor vehicle was causally related to an injury to person or property or to a particular incident on the highway may be crucial in a subsequent criminal prosecution. From other information it may be clear that whoever was driving a given vehicle was guilty of a crime, and the only question is whether the defendant was the operator of that vehicle." (Mansfield, *supra,* 1966 Sup.Ct. Rev. 103, at p. 122.)

It does not matter, as the People appear to contend, that in some "hit-and-run" situations prosecuting authorities may

[5]McCormick asserts that "When . . . the circumstances indicate reckless or wanton conduct by the person compelled to [comply with a "hit-and-run" statute] the required statement identifying himself as a person involved clearly meets the accepted test of incrimination, that is, the existence of substantial danger that the required statement will furnish evidence of an essential element of a crime." (P. 283.) However, McCormick feels that since a "hit-and-run" statute is a reasonable police power regulation the privilege must yield "to the extent necessary to make effective this power of protecting safety on the highways." (P. 283.)

be able to establish the driver's identity beyond a reasonable doubt from other evidence such as eyewitness identification of the driver, his vehicle, or its license plate. ''[T]he basic purposes that lie behind the privilege against self-incrimination . . . relate . . . to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.' '' (*Tehan* v. *Shott,* 382 U.S. 406, 415 [15 L.Ed.2d 453, 86 S.Ct. 459].) ''Governments, state and federal, are . . . constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth.'' (*Id.* at p. 414 [15 L.Ed.2d at p. 458].)

The People urge that the privilege may not be asserted as a defense to compliance with section 20002 of the Vehicle Code because the state may regulate the use of its highways and the operation of motor vehicles by conditioning participation in these activities on compliance with section 20002 and other ''hit-and-run'' statutes even in cases where this entails a forced waiver of the constitutional privilege against self-incrimination. (See generally, Note, *Required Information and the Privilege Against Self-Incrimination,* 65 Colum.L. Rev. 681, 686-687.) This theory, employed in a number of state court decisions prior to *Malloy* v. *Hogan, supra,* 378 U.S. 1, to reject claims that ''hit-and-run'' statutes violated state constitutional prohibitions against compulsory self-incrimination (e.g., *State* v. *Razey* (1929) 129 Kan. 328, 282 P. 755; *People* v. *Rosenheimer,* 209 N.Y. 115 [102 N.E. 530] ; see *People* v. *Diller, supra,* 24 Cal.App. 799) is untenable.

In *Bagley* v. *Washington Township Hospital Dist.,* 65 Cal.2d 499, 503-507 [55 Cal.Rptr. 401, 421 P.2d 409], we held that the state may not condition the enjoyment of some benefit or privilege on the nonassertion of a constitutional right where ''the utility of imposing the conditions [does not] manifestly outweigh any resulting impairment of constitutional rights.'' As will be demonstrated hereinafter, the objective underlying section 20002 of the Vehicle Code can be achieved by a means unoffensive to the privilege against self-incrimination.

Since compliance with section 20002 of the Vehicle Code may require disclosures coming within the privilege against self-incrimination and since the purpose of that section is to protect property owners from financial loss by requiring drivers involved in accidents resulting in property damage to

disclose their identities (*People* v. *Stansberry,* 242 Cal.App.2d 199, 203 [51 Cal.Rptr. 403] ; *Miglierini* v. *Havemann,* 240 Cal. App.2d 570, 573 [49 Cal.Rptr. 795]), the present case exemplifies a conflict much discussed by commentators in recent years, the conflict between the individual's right to protection under the Fifth Amendment privilege against self-incrimination and the government's substantial interest in having citizens report or otherwise divulge information to effectuate various regulatory measures designed to promote the public welfare. (See, e.g., Mansfield, *supra,* 1966 Sup.Ct.Rev. 103; McKay, *Self-Incrimination and the New Privacy,* 1967 Sup.Ct.Rev. 193, 204-224, 228-232 ; Note, *supra,* 65 Colum.L.Rev. 681.)

Obviously, "it is imperative to effect an accommodation that will permit government to collect vitally needed information without impairing the purposes of the privilege." (McKay, *supra,* at p. 204.) Decisions of the United States Supreme Court suggest a form of accommodation which provides the appropriate resolution of the conflicting interests involved in the present case. In brief, these decisions provide (1) that the state may require a person to disclose information otherwise subject to a claim of privilege if in place of the protection conferred by the privilege there is substituted another protection, having the same scope and effect as the privilege, namely, immunity from use of the information or its fruits in connection with a criminal prosecution against the person; and (2) that, when consistent with both legislative intent and effective enforcement of the criminal laws, a court may hold that such immunity exists, and therefore that disclosure is required, despite the absence of any specific legislative grant of immunity.

In *Ullmann* v. *United States,* 350 U.S. 422, 438-439 [100 L.Ed. 511, 524, 76 S.Ct. 497, 53 A.L.R.2d 1008], the United States Supreme Court stated that the "sole concern" of the privilege is "with the danger to a witness forced to give testimony leading to the infliction of 'penalties affixed to the criminal acts. . . .' " which such testimony may disclose and that "Once the reason for the privilege ceases, the privilege ceases." In *Marchetti* v. *United States, supra,* 390 U.S. 39, 58 [19 L.Ed.2d 889, 903, 88 S.Ct. 697], the court reaffirmed the proposition that "the privilege against self-incrimination may not properly be asserted if other protection is granted which 'is so broad as to have the same extent in scope and effect' as the privilege itself."

■ Recent decisions have made it clear that an individual raising a valid claim of privilege need not be given complete immunity from prosecution in order to be compelled to testify.[6] (*Gardner* v. *Broderick*, 392 U.S. 273, 276 [20 L.Ed.2d 1082, 1085, 88 S.Ct. 1913]; *Albertson* v. *SACB*, *supra*, 382 U.S. 70, 79-81 [15 L.Ed.2d 165, 171-172, 86 S.Ct. 194]; *Murphy* v. *Waterfront Com.*, 378 U.S. 52, 79 [12 L.Ed.2d 678, 84 S.Ct. 1594].) The rule is, as stated in *Gardner*: "Answers may be compelled regardless of the privilege if there is immunity from federal and state *use of the compelled testimony or its fruits* in connection with a criminal prosecution against the person testifying." (Italics added.)

This rule is the logical corollary of the rule that when information is the product of an involuntary disclosure secured in violation of the privilege the person disclosing the information is merely protected from prosecution on the basis of such information and the fruits thereof and not from any and all prosecution for offenses to which the information relates. (E.g., *Garrity* v. *New Jersey*, 385 U.S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616]; *Miranda* v. *Arizona*, 384 U.S. 436, 479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 10 A.L.R.3d 974] [majority opinion], 500, 522 [16 L.Ed.2d at pp. 738, 751] [dissenting opinions].)

■ Accordingly, if the disclosures compelled by section 20002 of the Vehicle Code and the fruits of such disclosures may not be used in a criminal prosecution relating to the accident, the requirements of the privilege against self-incrimination are met. ■ There is no statute explicitly providing for evidentiary use restrictions for persons complying with section 20002, subdivision (a), in cases where such persons would otherwise have a valid claim of privilege. Therefore, we must consider whether such restrictions may properly be imposed by this court.

There is precedent for judicial imposition of appropriate restrictions on the use of statements in order to compel otherwise privileged testimony. In *Murphy* v. *Waterfront Com.*, *supra*, 378 U.S. 52, petitioners were subpoenaed to testify at a

---

[6]Language in *Counselman* v. *Hitchcock*, 142 U.S. 547, 585 [35 L.Ed. 1110, 1122, 12 S.Ct. 195] ["[N]o statute which leaves the party or witness subject to prosecution after he answers the criminating questions . . . can have the effect of supplanting the privilege . . . ."], justified until recently speculation that only complete immunity from prosecution for an offense revealed by information the disclosure of which is compelled would supplant the privilege. (See Mansfield, *supra*, 1966 Sup.Ct. Rev. 103, 164; McKay, *supra*, 1967 Sup.Ct.Rev. 193, 229-230.)

hearing conducted by the bistate Waterfront Commission of New York Harbor concerning a work stoppage at certain piers. Although granted immunity from prosecution under the laws of the two states whose criminal laws were potentially applicable, New York and New Jersey, petitioners refused to respond to questions on the ground that the answers might tend to incriminate them under federal law, to which the grant of immunity did not purport to extend. On certiorari, petitioners attacked a decision of the New Jersey Supreme Court upholding civil contempt judgments rendered against petitioners for their refusals to answer. The United States Supreme Court held that (1) "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him" and (2) "in order to implement this constitutional rule . . . the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. . . ." (*Id.* at p. 79.)

In *Marchetti* v. *United States, supra,* 390 U.S. 39, 58 [19 L.Ed.2d 889, 903, 88 S.Ct. 697], the government urged the court to permit continued enforcement of the federal occupational tax on wagerers, including the registration provisions, by imposing restrictions from use of self-incriminating information employed in *Murphy.* The court recognized this suggestion as "in principle an attractive and apparently practical resolution of the difficult problem before us." Since the court explicitly assumed that the principal purpose of the federal wagering tax was "the collection of revenue, and not the punishment of gamblers" (*id.* at p. 57 [19 L.Ed.2d at p. 903]) and recognized that the registration requirement was a regulatory requirement designed to assure collection of the tax, the "problem" before the court was essentially the same problem presented in the present case, the accommodation of the individual's right to assert his privilege against self-incrimination and the government's interest in requiring the disclosure of information to effectuate a legitimate civil regulatory measure.

Although it recognized that the judicial-imposition-of-use-restriction approach was theoretically acceptable as a device for reconciling conflicting private and governmental interests, the court declined to use it in *Marchetti.* The court felt this approach was inappropriate in the circumstances of that case

for two reasons: (1) The very terms of the wagering tax statute evidenced Congress' intent that information obtained from registration should be provided to interested prosecuting authorities, and the Internal Revenue Service evidently consistently carried out this intention, so that "the imposition of use-restrictions would directly preclude effectuation of a significant element of Congress' purposes in adopting the wagering taxes." (*Id.* at pp. 58-59 [19 L.Ed.2d at pp. 903-904].) (2) Imposition of such restrictions would oblige state prosecuting authorities to establish in each case of alleged illegal wagering that their evidence was untainted by any connection with information divulged because of the wagering tax, so that the enforcement of state gambling laws might be seriously hampered. (*Id.*)[7]

With regard to the second of these reasons, it must be conceded that one result of any statutory or judicial restriction on the use of compulsorily divulged information or its fruits in connection with a criminal prosecution against the person divulging the information is that in any such prosecution the government must bear the burden of establishing that its evidence was untainted by any connection with the information divulged, i.e., that the evidence came from an independent source. (*Marchetti* v. *United States, supra,* 390 U.S. 39, 59, fn. 17 [19 L.Ed.2d 889, 904, 88 S.Ct. 697].) If this fact alone were sufficient cause to reject the use-restriction approach, the United States Supreme Court would not have adopted it in *Murphy* v. *Waterfront Com., supra,* 378 U.S. 52, 79 [12 L.Ed.2d 678, 695, 84 S.Ct. 1594], in solving a problem involving a state demand for information and a federal prosecutorial interest nor recognized it as "in principle an attractive and apparently practical" solution to the problem in *Marchetti* v. *United States, supra,* at page 58 [19 L.Ed.2d at p. 903], which involved a federal demand for information and both state and federal prosecutorial interests. Indeed, an excessive concern for the government's burden of showing that evi-

[7]In *Grosso* v. *United States, supra,* 390 U.S. 62, a companion case involving the federal excise tax on wagering, the court also declined to impose use-restrictions on information obtained as a consequence of payment of the tax. "[I]t would be inappropriate to impose such restrictions upon one portion of a statutory system, when we have concluded that it would be improper, for reasons discussed in *Marchetti,* to do so upon 'an integral part' [footnote omitted] of the same system." (390 U.S. at p. 69 [19 L.Ed.2d at p. 913].) In *Haynes* v. *United States, supra,* 390 U.S. 85, a case involving a claim of privilege as a defense to failure to register a certain firearm as required by federal law, the court declined, "for reasons indicated in *Marchetti, supra,* and *Grosso, supra,* to impose [use-]restrictions . . . ." (390 U.S. at p. 100 [19 L.Ed.2d at p. 934].)

dence used in a prosecution is untainted is inherently at odds with the Supreme Court's recently clarified basic position that immunity sufficient to justify compelling a disclosure otherwise privileged need not be complete immunity from prosecution.

The reason the Supreme Court pointed to the potential burden on state prosecuting authorities as one basis for rejecting the use-restriction approach in *Marchetti* was most likely the court's concern with a delicate problem of conflicting federal and state interests. In *Murphy,* in order to "accommodate the interests of the State and Federal Governments in *investigating and prosecuting crime*" the court held that a state may compel a witness to give testimony which may be incriminating under federal law and that if it does so "the Federal Government [is] prohibited from making any . . . use of [such] compelled testimony and its fruits [in connection with a criminal prosecution against him]." (378 U.S. 52, 79 [12 L.Ed.2d 678, 695], italics added.) This accommodation was consistent with the traditional notion that in our system of federalism the states and not the federal government have primacy in the field of law enforcement. In *Marchetti,* on the other hand, the imposition of use-restrictions on *state* prosecuting officials, as urged by the United States, would have involved putting a possibly considerable burden on state prosecuting authorities in order to serve a federal interest in obtaining information as an incident to a purported but dubious interest in raising revenue, information which the court felt Congress could secure by "other methods, entirely consistent with constitutional limitations. . . ." (390 U.S. at p. 60 [19 L.Ed.2d at p. 904].) Thus, the accommodation suggested by the federal authorities in *Marchetti* would have been consistent with neither the court's concern for federal-state comity nor with the rule prohibiting infringement of constitutional rights for an otherwise legitimate state purpose where that purpose could be accomplished by a less onerous means. (E.g., *Aptheker* v. *Secretary of State,* 378 U.S. 500, 512-513 [12 L.Ed.2d 992, 1000-1001, 84 S.Ct. 1659] ; *Sherbert* v. *Verner,* 374 U.S. 398, 407 [10 L.Ed.2d 965, 972, 83 S.Ct. 1790].)

In the present case, on the other hand, the imposition by this court of a restriction on the use by prosecuting authorities of information supplied in compliance with section 20002, subdivision (a), of the Vehicle Code is not only "in principle an attractive and apparently practical resolution of the diffi-

cult problem before us" (*Marchetti* v. *United States, supra,* 390 U.S. 39, 58 [19 L.Ed.2d 889, 903, 88 S.Ct. 697]), but it will neither frustrate any apparent significant legislative purpose nor unduly hamper criminal prosecutions of drivers involved in accidents resulting in damage to the property of others.

The face of the statute does not disclose any legislative intent to use the required disclosure of information to facilitate prosecutions for possible criminal acts occurring in connection with automobile accidents involving property damage. If the driver can locate the owner or person in charge of the property damaged he need only disclose to that individual his and the automobile owner's name and address; if he cannot locate such person, he must leave a written notice containing' the same information and "a statement of the circumstances" surrounding the accident as well as "notify" local law enforcement officials, ostensibly to make sure that the owner or person in charge of the damaged property can contact the driver by consulting the written notice or, if it has been removed or destroyed, such officials.

Not only does the statute on its face fail to disclose any legislative concern with facilitating criminal prosecutions but the courts have consistently recognized that the purpose of the statute is to promote the satisfaction of civil liabilities arising from automobile accidents involving property damage by inducing all drivers involved in such accidents to identify themselves to the owners or persons in charge of any damaged property. (*People* v. *Stansberry, supra,* 242 Cal.App.2d 199, 203; *Miglierini* v. *Havemann, supra,* 240 Cal.App.2d 570, 573.) In short, in enacting section 20002 and its predecessor sections the Legislature was concerned only with protecting the interests of private parties who suffer loss as the result of property damage occurring in automobile accidents.

Nor is section 20002 part of any larger legislative scheme to facilitate criminal prosecutions. Rather, it is related in coverage and intent to the financial responsibility law (Veh. Code, §§ 16000-16553)[8] the primary purpose of which is to protect

[8]Section 16000 requires the driver of every vehicle involved in an accident resulting from the operation of a motor vehicle on the public highways and damaging the property of any one person in an amount exceeding $200 to report the accident to the Department of Motor Vehicles. With certain exceptions, every such driver must then demonstrate the financial ability to satisfy any judgment that may be recovered against him or the owner of the vehicle for damage to property or suffer a suspension of his driving privileges. (Veh. Code, §§ 16020, 16050-16060, 16080.)

persons who while lawfully using the public highways suffer financial loss as a result of another's negligent use of the highways. (*Mission Ins. Co.* v. *Feldt,* 62 Cal.2d 97, 101 [41 Cal.Rptr. 293, 396 P.2d 709]; *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.,* 58 Cal.2d 142, 153 [23 Cal.Rptr. 592, 373 P.2d 640].)

Finally, it is instructive, in determining legislative intent, to consider an analogous field of legislation involving a similar conflict between requiring disclosures for noncriminal purposes and the privilege against self-incrimination. In the statutes requiring drivers involved in accidents resulting in personal injury or death to file accident reports, the Legislature has explicitly subordinated the state's prosecutorial interest to the interest in obtaining the disclosure.[9]

In the present case there is no problem of conflicting state and federal interests; it is the state which both demands disclosure of information in "hit-and-run" accidents and prosecutes those who commit criminal acts on the highways. Imposing use-restrictions in the present case merely involves this court in making a judgment, based on an assessment of probable legislative intent, that the Legislature would prefer to have the provisions of section 20002 of the Vehicle Code upheld even in cases involving possible criminal misconduct at the cost of some burden on prosecuting authorities in criminal cases arising out of or related to an accident covered by that section rather than avoid that burden at the cost of significantly frustrating the important noncriminal objective of the legislation. Imposition of use-restrictions in the present case will not preclude the Legislature from overriding our decision if it wishes by simply enacting legislation declaring that information derived from disclosures required by section 20002, subdivision (a), *may* be used in criminal prosecutions, in which case the privilege could be claimed in appropriate situations.

---

[9]Section 20012 of the Vehicle Code provides that "All required *accident reports* . . . shall be without *prejudice* to the individual so reporting and shall be for the *confidential use* of the Department of Motor Vehicles and the Department of the California Highway Patrol, except that the Department of the California Highway Patrol or the law enforcement agency to whom the accident was reported shall disclose the contents of the reports . . . to any person who may have a proper interest therein, including, but not limited to [various enumerated private parties possibly affected financially and/or legally by the accident], . . ." (Italics added.) Section 20013 provides that except to prove compliance or noncompliance with the requirement that an accident report be filed no accident report may be "used as evidence in any trial, civil or criminal, arising out of an accident, . . ."

There is another significant distinction between the circumstances in *Marchetti* and the circumstances in the present case. In *Marchetti* the imposition of use-restrictions on information obtained as a result of compliance with the federal wagering tax would have had a much more sweeping effect on state law enforcement than would the imposition of such restrictions here. It appears that most—perhaps almost all—violators of state criminal prohibitions against wagering and related activities are subject to the disclosure requirements of the federal wagering tax. (*Marchetti* v. *United States, supra,* 390 U.S. 39, 44-46, fns. 5-6 [19 L.Ed.2d 889, 895-897, 88 S.Ct. 697].) Thus, the imposition of use-restrictions in order to permit Congress to compel all wagerers to comply with the wagering tax law would have meant that in almost all state prosecutions for wagering or related illegal activities the state would be forced, if the defendant proved compliance with the federal law, to establish that its evidence was untainted. This situation might indeed seriously hamper such state prosecutions. By contrast, far from all criminal violations committed on the highways by drivers of motor vehicles involved property damage. The burden resulting from the imposition of use-restrictions in the latter situation will exist only in those instances where property damage occurs in the course or as a result of a criminal violation committed on the highways by a driver.

We conclude that criminal prosecutions of drivers involved in accidents will not be unduly hampered by rules that prosecuting authorities may not use information divulged as a result of compliance with section 20002, subdivision (a), of the Vehicle Code or the fruits of such information and that in prosecutions of individuals who have complied with that section the state must establish that its evidence is not the fruit of such information.

Since imposition in the present case of use-restrictions as described above will neither frustrate any apparent legislative purpose behind the enactment of section 20002 of the Vehicle Code nor unduly hamper criminal prosecutions of drivers involved in accidents; and since the imposition of such restrictions will not preclude the state Legislature from overriding our decision if it wishes, the reasons impelling the United States Supreme Court to reject the "attractive and apparently practical" suggestion of imposing restrictions in *Marchetti* v. *United States, supra,* 390 U.S. 39, 58 [19 L.Ed.2d 889, 903, 88 S.Ct. 697], are absent in the present case, and we

must, in order to fulfill our responsibility to protect the privilege against self-incrimination, hold that where compliance with section 20002 of the Vehicle Code would otherwise be excused by an assertion of the privilege, compliance is, as in other cases, mandatory and state prosecuting authorities are precluded from using the information disclosed as a result of compliance or its fruits in connection with any criminal prosecution related to the accident.

In the present case, the superior court correctly concluded that at the time of the accident Byers had reasonable ground to apprehend that if he stopped to identify himself as required by section 20002 of the Vehicle Code he would confront a substantial hazard of self-incrimination. The court had before it the fact that Byers was charged with violating section 21750 of the Vehicle Code and the stipulation that the accident giving rise to the obligation under section 20002 resulted from the alleged violation of section 21750.

Although the privilege against self-incrimination was applicable, the privilege does not furnish a defense to a charge of violation of section 20002 because the purpose of the privilege is satisfied by the rule we adopt today that prosecuting authorities are precluded from using information divulged in compliance with section 20002 and the fruits of such information in circumstances where the driver would otherwise be constitutionally privileged not to comply. Thus, the judgment granting the writ of prohibition cannot be affirmed on the theory, employed by the superior court, that Byers was privileged to withhold the information required by section 20002.

However, it does not follow that the judgment must be reversed; we must determine whether, in light of the fact that we here announce a doctrine new to this state's jurisprudence, fairness dictates that Byers not be punished for his failure to comply with section 20002.

In *Murphy* v. *Waterfront Com., supra,* 378 U.S. 52, 79-80 [12 L.Ed.2d 678, 695-696, 84 S.Ct. 1594], the United States Supreme Court reversed the petitioners' contempt convictions because although under the holding of the case they could be required to testify in view of the court-declared restrictions on the use of their testimony in any federal prosecution, at the time they originally refused to answer they had a reasonable fear that their testimony could be used by federal authorities in a criminal prosecution. At the time they refused to answer, petitioners' claim of privilege was ineffective under then-controlling decisions. The court, in holding for the

first time that the privilege was applicable and that it was satisfied by use-restrictions, felt that fairness required that petitioners be given the opportunity to avoid contempt convictions by answering the questions put to them in light of the new protection afforded them as a matter of constitutional right under the holding of the case.

In the present case, Byers is in a position substantially similar to that of petitioners in *Murphy*. Byers had a reasonable basis for fearing that compliance with the "hit-and-run" statute would produce incriminating evidence which could be used against him in a criminal prosecution. At the time of the accident, Byers' claim of privilege was not supported by then-controlling decisions.[10] This court now holds that the privilege against self-incrimination is applicable to such a case, as Byers urges, but we also establish today for the first time restrictions on the use of information disclosed in compliance with the "hit-and-run" statute, and on the basis of such restrictions, we hold that compliance with the statute is not excused by the existence of the privilege.

The differences between the position of the petitioners in *Murphy* and Byers in this respect are not material. Byers did not expressly claim the privilege when he left the scene of the accident, but if he had stopped to do so, he would in the light of existing law thereby have rendered nugatory any claim of privilege. Although in *Murphy* the court in vacating the contempt judgment provided that the petitioners would then be required to testify in the light of the new protection afforded them should the state authorities still wish to question them, in the instant case, it does not appear that any valid purpose would be served by requiring Byers to now comply with the "hit-and-run" statute.

We conclude, on the basis of *Murphy* v. *Waterfront Com.*, *supra*, that it would be unfair to hold that although Byers correctly asserted that the Fifth Amendment privilege was applicable to the question of his compliance with the "hit-and-run" statute he should have complied because of use-restrictions which he could only have speculated might exist.

The judgment is affirmed.

Traynor, C. J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

---

[10] In this respect Byers is in a better position than the petitioners in *Murphy*. They were faced with clear decisions that the privilege was inapplicable, whether or not their statements would be incriminating in

BURKE, J.—I dissent. The majority opinion holds that the privilege against self-incrimination, though applicable to section 20002 of the Vehicle Code, does not furnish a defense to a charge of violation of that section since the privilege is satisfied by precluding prosecuting authorities from using information divulged in compliance therewith (*ante*, p. 1057). Nevertheless, the majority would affirm the judgment granting the writ of prohibition to Byers on the sole ground that "fairness dictates that Byers not be punished for his failure to comply with section 20002," relying upon *Murphy* v. *Waterfront Com.*, 378 U.S. 52, 79-80 [12 L.Ed.2d 678, 695-696, 84 S.Ct. 1944] (*ante*, p. 1057). I do not believe that the rationale of *Murphy* should be applied to the instant case.

In *Murphy,* petitioners claimed the privilege and refused to testify at a state agency hearing on the ground that their testimony might tend to incriminate them under federal law. The court held that petitioners could be compelled to answer the questions propounded to them, since the federal authorities would be prohibited from using their testimony or its fruits against them in any subsequent criminal proceeding. However, the court vacated the contempt judgment in order to afford petitioners an opportunity to testify and thereby purge themselves of contempt. The court noted that at the time petitioners refused to testify, they had a "reasonable fear, based on this Court's decision in *Feldman* v. *United States* . . . [322 U.S. 487 (88 L.Ed. 1408, 64 S.Ct. 1082, 154 A.L.R. 982)], that the federal authorities might use the questions against them. . . ." (378 U.S. at p. 79 [12 L.Ed.2d at p. 695].)

The result reached in *Murphy* appears defensible, as it not only gave petitioners, who had claimed the privilege under a "reasonable fear" of federal prosecution, an opportunity to purge themselves of contempt by furnishing the requested information, but also promoted the interests of the state in obtaining that information from them. However, *Murphy* should not be used to totally exculpate Byers from his violation of section 20002.

Unlike the petitioners in *Murphy,* Byers claimed no privilege when he violated section 20002—instead he simply left

a subsequent federal prosecution; *Malloy* v. *Hogan, supra,* 378 U.S. 1, holding the federal constitutional privilege applicable to state proceedings, was a companion case of *Murphy.* At the time of the accident, the leading California decision, *People* v. *Diller, supra,* 24 Cal.App. 799, left open the possibility that in some cases the state constitutional privilege would excuse noncompliance with a "hit-and-run" statute.

the scene of the accident without furnishing the required information. Nothing in the record suggests that in so doing Byers intended to claim or exercise the privilege against self-incrimination under a reasonable fear of prosecution. As the majority opinion indicates, California decisions in existence at the time of the accident did not recognize the application of the privilege to "hit-and-run" cases. (*ante,* p. 1058.)

Therefore, if Byers was unaware of the existence of the privilege and was not acting in reliance upon existing state law, how are the ends of justice met by excusing Byers from conduct which, as the majority hold, remains unlawful and unprivileged? I cannot see any element of unfairness in holding Byers fully responsible for the consequences of his deliberate violation of section 20002.

Moreover, unlike the result reached in *Murphy,* the majority holding promotes no corresponding governmental interest to balance a determination of leniency towards Byers, since obviously any offer by him to comply with the requirements of section 20002 would come several years too late.

In my view, the judgment of the superior court granting a writ of prohibition was erroneous and should be reversed with appropriate instructions.

McComb, J., concurred.

Appellant's petition for a rehearing was denied October 15, 1969. McComb, J., and Burke, J., were of the opinion that the petition should be granted.